We have before us four cases set for argument. We're going to have a busy morning, so let's get started. Our first case is Custom Media Technologies v. DISH Network Corporation. Mr. Morton, you're reserving four minutes of your time for rebuttal. Yes, Your Honor. Okay, you may proceed. My name is Ray Morton. I represent Custom Media. With respect to the final written decision, I believe that there are two primary reasons the Board erred in its analysis under Step 1, whether or not the claimed invention improves the function of a computer. First, the Board did not have the benefit of the ANCORA and SRA decisions from this Court. The final written decision came out in July of 2018. Since then, we've had Data Engine, ANCORA, and SRA. ANCORA and SRA specifically identify that improving the security of the system can be an improvement in the functioning of the computer if done with specificity. The Board struggled in the final written decision trying to identify what it believed was the improvement to the system. Without the benefit of SRA and ANCORA, the Court determined that there was no benefit. I think that that was... So you're saying there's an improvement to the security of the system? Absolutely. The security of the system. Yes. What is that improvement? Yeah, so what the claim does is it adds, and I think it may help if you look at the reply, the Gray Brief on page 1. We have an annotated figure 2A of the system identifying the claim elements. So what you'll see is largely a set-top box functionality. What we've added on the left is microprocessor number 12. So normally, that microprocessor does not exist in the set-top boxes. So the patent was filed in 1997. Earlier, set-top boxes did not have memory. They would just play movies or TV shows or whatever it is that were streamed down to the box. In the mid-'90s, they started adding storage. So you can store movies, and the TiVo era started coming out. There was a real problem with that is the content providers did not want to allow their data to be stolen. We know Adapster and so forth and the proliferation of IP theft that occurred from that. So what the claim does is it adds a microprocessor that sits between the user interface and the programming and playback circuitry. So this microprocessor interferes with the user's normal operation of the system. Normally, a user, if you store data on your computer, you always have access to that data, and you can delete that data. You can play it. You can share it. You can do whatever you want to. What this system does is it overrides the user's ability to have unfettered access to the data that's stored on the system. So the microprocessor controls what functions the user is able to impart or program into the playback circuitry and processing circuitry. Additionally, so that's one aspect is that we have this middleman control. The second aspect... Do you agree, though, just to interrupt for a minute, do you agree that the language by which it's preventing access is pretty broad here? I mean, you do have the language deleting or scrambling, which seems more specific. But then the claim says, or blocking further access to the data. I mean, blocking further access to the data is broad enough to cover deleting, scrambling, and any other thing that would prevent a person from being able to access the data. So isn't that pretty broad? Well, first is I think it is broad more specific than that. So I don't believe that blocking includes deleting, for example. So one of the benefits of the patent is that the data is never actually returned to anybody. So if the microprocessor decides to invoke the simulated return, it can void your authorization key, access key. So you no longer have access to it. Or it could scramble it. But the data is still there on the box. And that's the real vulnerability problem is the microprocessor prevents that from being accessed. The benefit is improved efficiency as well to the system. The patent talks about pre-storing or pre-fetching data that can be on the system. This is on the other side is when you have finished renting the movie or game or something like that is you can re-rent it again. The data is already there. So the system doesn't have to go re-fetch the data. So it saves time and throughput through the system. So that's another enhanced versatility the system provides. And where in the specification does it define blocking in the way you're using it so that it's distinct from deleting and scrambling? Yes. So if you look at... I'll give you a couple of examples here. If you look at the... I'll give you a couple of them. So if you look at column 7, line 66 through column 8. Line 3, it discusses the use of an authorization key must be received to unlock the rented data. So that's on the forward side. If you look on the column 9, lines 9 and 10, it talks about the reverse. The data may be scrambled, encrypted, or otherwise blocked. But doesn't it then equate blocking with scrambling and decrypting? Scrambled, decrypted, or otherwise blocked. I mean, that's my point is that blocking is broad. I believe it's broad, but I don't think it includes... Let me answer it this way. I don't think it includes deleting. And scrambling is very specific. So while scrambling would, I guess... I don't think scrambling blocks you from the data. It says that if you... Let me just give you an example. We talk about on column 10, if you start at line 1 on down, we talk about specific techniques on how you can scramble the data. And it talks about the serial code management system as an example. And where it degrades the quality of the data such that it's not usable for pirating and so forth. I think that that's what it's talking about is scrambling is it makes it unusable. I don't think that that's the same as blocking. I mean, if I can... If you power off my phone, you've blocked me from being able to use it. But I have... You haven't blocked me from being able to use it. You've prevented me from being able to use it. But I have it. So you haven't blocked me from access. I think that's the distinction. They're very similar. I'm not going to dispute that it's somewhat broad. But, you know, that gets into the 102, 103 issues. It gets into 101, too, to a certain extent when you're talking about having enough specificity that you can see it's a technological improvement, for example. That's... So I do think the breadth of a claim can matter. Oh, and I don't disagree with that. I think, though, that we can look at the claim or the specification to understand the effect of what blocking entails. And the blocking that we have is positional, that the microprocessor is in between the devices and only passes through what controls you have. I believe that that's what the blocking is and also the voiding of the access code. Okay. Did you have any other examples that you wanted to identify in the specification for the meaning of blocking? So if we go to... Well, I would... Maybe I can find one during the recess, but... Or the break. But I think that that... That is kind of what's going on here and it's improving the security of the system. Where is the improvement? What system are you talking about? The computer system? The set-top box, yes. The claim computer set-top box. But what you're doing is you're programming the microprocessor to handle these different scenarios, right? Correct. And so this is somewhat similar to... In the microprocessor, it's just a regular computer. Well, yes. And using conventional elements to override the normal function of the system is still... You haven't improved the microprocessor in any way or any of these other pieces of hardware or these other factors that you see here. You've improved the security of the use of the content. Correct. And that's exactly what happened in Encora. In Encora, they used the BIOS memory to store the license key. They didn't change the BIOS. They didn't make the BIOS better. They didn't change any other components. But by placing the data in the BIOS, it blocked the user or hackers from being able to get to the license key. That's a passive blocking. We have an active blocking. Our microprocessor actively prevents it through the arrangement here. We are solving the same problem. Encora, SRI, and the 437 patent were all filed between... You want to come in here today and rely on those cases and use the word we're improving the security. But I don't see security, the word security, anywhere in the claims. It doesn't seem like the field of invention is talking about security. It's talking about computerizing return of data in a very, very broad way. Why isn't this just the same thing that was going on in Alice? It was taking some kind of fundamental business practice that occurred in the real world and just writing software for it and not stating with any kind of specificity like there was in Finjan and there's others that we've created in new types. Finjan, for example, where there was some kind of actual new data structure that was a security tag. This doesn't use the word security in claim one, does it? Did I misread it? No, not at all. Security doesn't show up there, but security didn't show up in the claim in Encora and SRI. Well, I have to look at the one in SRI. But if you look at the bottom of column or the middle of column eight, so in line 14 through the top of column 10, and it's talking about the virtual return is to prevent. I'm sorry. I got the slides wrong. The bottom of column nine starting at line 65 to the first line of column 10. And it talks about the system being able to add this copywriting protection to prevent the unauthorized duplication of intellectual property pirates. And if you really look at claim one, the first elements, one through E, we're not disputing that those are very conventional elements. What we've added to the system is the element F, which gets in between the user's ability to have unfettered access to program the processing functions and to access the data. This is very similar to using the BIOS to prevent a hacker from accessing the license key in Encora. I mean, the plain language of F looks like it's talking about how you digitally return or otherwise block data. It doesn't sound like it's directed to copyright or any of those things. It doesn't say anything about that. Well, of course, the claim is informed by the specification. Sure, you can point to a few examples in the specification that are certain benefits of certain embodiments. But it doesn't seem overall that F is directed at that. It's directed at the idea of, in this new digital world of digital transmission of data, we have to find some equivalent to somebody going back to the old blockbuster and putting it through the mail slot. Well, but we don't actually physically return. And I see I'm into my rebuttal time. But the plain language says it's enacting a simulated return. Correct. So it's doing the equivalent of that old real-world practice in a new setting. But that's never been enough to make it eligible under 101, at least post-ALICE, has it? Well, but we don't actually return the data. We do talk about in the – as an example. But what difference does it make? You either delete it, you scramble it, or you otherwise block it. Well, one of the benefits when you – It would be no different than if blockbuster's policy was these VHS cassette tapes, and I'm dating myself, obviously, by VHS, but are so cheap that instead of returning them, just promise to throw them in the trash. So a difference is that the data is still there and available for the user to re-rent without having to go through the whole process. Not if it's deleted. And the deleting step is not. But the claim provides that the processor has the ability for the network to control which of the three it wants to do. One of the problems I'm having with your argument about how this improves set-top boxes because it's a microprocessor being added to a set-top box is that the claim doesn't say set-top box, right? It says a system for processing, recording, and playback of audio and video data. And then even the abstract says that this thing on which the invention can reside can be a television, a VCR, a DVD, a personal computer. So if it's a personal computer, of course personal computers had microprocessors in 1997 or whatever the time period was that you were talking about. It did, and those microprocessors let the user access the data however they wanted to access the data. What we've added is a second processor to the mix that interferes with the user using that processor to access the data. That's the difference between the two. If you look at the claim, you would then just say the processing circuitry 13 would be the typical microprocessor in a computer. What we've done is added something to the system that overrides the user's ability to use that microprocessor, the playback circuitry, the process circuitry, to access the data. So it limits the user's ability to do something. So I'd see. Yes, you're well into rebuttal time, but we'll restore your four minutes. Let's hear from Councilor Williams. You have 15 minutes. Thank you, Your Honor. May it please the Court. This is a case that falls very clearly into the heart of Alice and Bilstein. What we have is a claim that embodies a fundamental economic practice of renting content. It is done in the context of some limitations which limit that fundamental economic context to a particular technological environment. But that's exactly a thing Alice tells us is not enough to remove the claim from being directed to an abstract idea. This Court's case law following that sort of discussion in Alice, I think, has broken step one into sort of two classifications of cases. One, where there's an accomplishment in computer science or engineering. The other, where you have a conventional business practice being implemented using technology that already exists. And this case is very definitely in that second category. There's nothing in the specification that describes how this processor that was just talked about interferes with the user's use of the system. There's nothing in the claim that describes or discusses interfering with the user's operation of the system. Do you agree that Claim 1 at 1F, the microprocessor, that that is enough to where it says it's an improvement in the security of the system? What does that mean to you? Well, I disagree that there's anything in Element 1F that improves the security of the system. That is a microprocessor that's implementing the abstract idea of renting content, which is fundamental economic practice. So, yeah, I completely disagree that there's anything there that's new in terms of improving security. The fundamental technologies of digital rights management, which we could argue would be inventive and probably could have passed 101 muster, are not at issue in this case. Those are all conceded to be prior art techniques. So if there was a technical problem that had to be solved to rent data, that's not this patent. But you agree, though. You said, I heard you say something along the lines of the microprocessor is not interfering with the user's ability to use the system. But it is blocking access to this rented material when it does this simulated return. I mean, I'm not saying that that's enough to make it eligible under 101. But, I mean, there is something that microprocessor is in this paragraph limitation doing something. It does something. It's actually, I mean, the way that claim element is drafted, it's not clear to me that it's actually the microprocessor that's necessarily doing that. It could very well be the processing circuitry that's doing that. That's, I think, an ambiguity in how the claim is drafted. And it's, I think, intentionally ambiguous. But, I mean, I can see in any system the microprocessor is doing something that's going to restrict how the system operates. That's the point of microprocessor is to, you know, have the system run according to some algorithm. So, I mean, I can see that there is definitely something that is involved in implementing this idea of renting the data, which necessarily means that there's going to be an end to that rental period at some point. But the claim is, again, not specific at all about how that's done. And as I think questioning has pointed out, it's broadly directed to any kind of blocking, whether that's deleting or scrambling. Again, all of those are old technologies. But the claim is clearly trying to get it any way that you would restrict access to the rental content at the end of the rental period. I can see that that's in the claim. But that's not a technological solution. It's not a technical solution at all. It's just the fundamental economic practice of renting has to come to an end at some point. And so you implement that with a computer. That's what the claim is saying. There's also an argument being made about a notice problem. That the abstract idea as defined in the petition is different than the abstract idea as defined in the institution decision, which is different from the abstract idea as defined in the final decision. And so could you talk about that a little bit and whether that's, in fact, a notice problem? Yeah, let me address that. So let me address the second issue. Let me go in reverse order. The final written decision articulates this identical abstract idea that's articulated in the institution decision. There is no change at all. It's delivering rented audio and video electronic content to a user. So that's clear. So there's no change. So at least from the time of the institution decision, patent owner was on notice of what the PTAB thought these claims were directed to, and that that was an abstract idea. And they had the entire trial to submit arguments and evidence that would suggest that that was incorrect. So at least with respect to notice problem, in all of this court's prior case law where there is some sort of notice problem found, it's where there was a theory that was changed midstream and there was no notice given to the patent owner. That's not this case. So then let me address the second. Could you also say that defining an abstract idea is different than defining a claim term? You know, that's an interesting question. I mean, could you have multiple different abstract ideas that you test one-on-one against, for example? I mean, you certainly could. I think there are a lot of similarities in the process of, I mean, if we think of Alice Step 1 as being in two parts, the first part is trying to determine the thing the claim is directed to, and then you ask, is that thing abstract, right? So there is the first part of that test requires something like a claim analysis. In this case, you're not doing a typical Markman claim analysis. You're not trying to find out what the full scope of the claim is and exclude things that are outside. Instead, you're trying to do a reductive exercise of develop the sense of what is this claim? Although it has many elements, what are they really directed to? Which things are the claims directed to as opposed to just being implementations or a technological environment within which the claim is being directed to an abstract idea? So they're certainly not the same inquiry, but they are in a similar vein in that you're doing some analysis of the claim text. So in that sense, I think you can draw a lot of analogies between the directed-to inquiry and claim construction. But again, in this case, it's sort of irrelevant. The board gave the construction of here's what the claims are directed to, and it never changed throughout the entire proceeding. Now, they did add a word from what was in the petition, and so that was a separate argument that I think is made by the patent owner. And there, again, we don't think there's any problem given that that change was made in direct response to arguments that were being made by the patent owner. The patent owner complained that our conception of what the claims were directed to, which did not include that word electronic in the petition, was essentially too reductive. It was ignoring aspects of the claim that made clear it was tied to this electronic environment. The board ultimately agreed with that critique of our view of what the claims were directed to and therefore presented this formulation, which then was the formulation that governed the entirety of the proceeding from institution to the final written decision. I think it's important just to point out a couple more things. I don't think I'm going to use all my time, but I do want to point out, I mean, obviously, this claim, again, we think this claim is very much in the category of implementing a conventional business practice using technology, which are exactly the facts you have in Alice, Bilski, also this court's decisions in Affinity Labs, Ultramershal, and OIP technology. I think almost on all fours with what we have happening here. In terms of this question about separating the microprocessor's functionality from the other circuitry, I just think it's important to point out that the PTAB made some very clear factual findings that this court should defer to. There's been no reason to call into question. There was certainly sufficient evidence for them to make these fact findings. For instance, if you look at appendix page 52, the discussion here relates to this question of, let's see, page 52 of the PTAB. I'm sorry, what page do you mean? 52. Thank you. Sorry. This is 52 of the final written decision, which is also page 52 of the appendix. The court says, to that end, patent owner first asserts that claim one's architecture of separating the processing circuitry from the microprocessor and assigning specific operations to that processing circuitry was unconventional. And then they go on. So that's essentially the argument we heard here today. And ultimately, the board rejected that, noting, we agree with petitioner. The 437 patent discloses that processing means 13 may include any number of circuits, signal processors, filters, or other data manipulation devices known in the art. The microprocessor may also include, but is not limited to, one or more of the following processing circuits or devices, citing the patent. And then they go on, quote, we agree that this directly supports petitioner's assertion that the separation of the processing circuitry from the microprocessor was, once again, quote, well understood, conventional, and routine. Anything else? I'm sorry. Anything else? I just want to mention, we did have an alternative basis for affirmance in the record. I'm happy to answer in our brief. I'm happy to answer any questions about that. Essentially, it goes to the PTAP's claim construction that required those elements to be separate. We don't think that was actually a requirement under the broadest reasonable interpretation. And if you reject that claim construction, then the prior art that we had in the record is going to be sufficient to render the patents invalid for the prior art. Okay. Thank you. Thank you. Yes. Mr. Gore, you have four minutes. Judge Stoll, you asked a question. Where else in the specification is it described using the access key and so forth? If you look at Column 37, just to get the whole context, Line 65 up through Column 38, Line 2, relevant part talks about that the automatic cancellation of an access key code prevents further access. It doesn't describe it as being you're going to unscramble it and so forth. So I think that they are separate. With respect to the abstract idea, I don't think that adding those four steps is just saying the same thing  Our claim is not about delivery. Our claim is about what to do and how to protect the data once it's already delivered. It talks about receiving the data, storing the data, and then simulating the return. What sort of different evidence or argument would you have made? Well, so the board came up with four things that supposedly are involved in all abstract ideas of delivering data. You have to identify the data that you want to rent, you have to then receive it, you have to play it, and then you somehow return it. Our patent actually talks about an embodiment where the data is actually prefetched before anybody decides they want to rent it. So the cable box would already have the movies on the box. But aren't you looking at the claims? Well, I've given you an example of what the evidence would be is we're contesting that these are inherent in the abstract idea of delivering the data. If we can show that there are systems out there that deliver rented data that don't abide by these four steps, then those four steps aren't inherent in part of the abstract idea, and the abstract idea is wrong. But shouldn't they be looking at the abstract idea to which the claims are directed? They should, and they didn't. But the claims say a receiver apparatus receiving audio or video data from at least one data feed. So that's not prefetched. No, the argument is that they're saying these four steps are somehow equivalent of what they're already saying, that they didn't change their ideas. And we would say that's not the abstract idea because we don't do that. Our claim doesn't require these things that you're saying are the abstract idea that we're applying to. So the somehow return is another one. We don't actually return it. That's the benefit of our system. It's more efficient because if you want to re-rent it, it's already there. I don't know what somehow return necessarily means. We do disclose it. This is what I'm trying to ask, and I must not be doing a good job, but how would it change the argument you would make, not for what the abstract idea is, but for why the claim is eligible? These are tweaks on what the abstract idea is so that the board can grapple with the overall question of whether the claim is directed to something that's ineligible. So I'm trying to understand why you're thinking you have a notice problem based on a change in the definition of the abstract idea. And I'm sorry, I didn't really get the gist of your question. So it really gets into step two because when we go to step two, we use the abstract idea, the constructed abstract idea, as our guide to figure out what the inventive concept is. If you redefine the abstract idea to include all of our claim elements, we're not supposed to use that. We don't have anything left. So we were describing to the board, hey, it's our element E or F that is providing the inventive concept here. Well, they swallowed that up in the way they recast the abstract idea. So we would have put on other evidence to say, well, we have other things that don't fit your abstract idea. If we don't do what you're saying is the abstract idea, then we can't be directed to the abstract idea. So I think it really gets into that we're prevented from having an effective step two analysis. In our cases, sometimes we have a definition of an abstract idea that differs from what the district court said was the abstract idea, what the board says was an abstract idea. Would that be improper under your view of how this is supposed to work? Maybe. No. Well, I say it depends on how close they are. If they're close, I think that that's the for real case and so forth. The issue is we're dealing with an administrative agency, and there's particular rules. When they come out in the initial decision and say this is what it is, they can't change it. They could have been silent on it. It announces the first time final written decision. Evidently that's okay. They can't change what they're doing because it deprives us of our notice and opportunity to respond to a second indictment. You can't sit there at a criminal trial and say, well, we're changing what the charge is. Could you conclude, please? Your Honor, we ask that you reverse the board. Thank you. We thank all parties for their arguments. Our next case is Strand v. United States.